# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| [1] SINCERE TERRY, | Civil Action No.: CIV-22-521-HE |
| [2] MIA HOGSETT, | |
| [3] TYREKE BAKER, | |
| [4] PRESTON NABORS, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| [5] TREVOUR WEBB, and | |
| [6] AUSTIN MACK, | |
| *Plaintiffs*, | |
| v. | |
| [1] JOHN O'CONNOR, in his official capacity as Oklahoma Attorney General, and | |
| [2] DAVID PRATER, in his official capacity as the Oklahoma County District Attorney, | |
| *Defendants*. | |

1.      Plaintiffs Sincere Terry, Mia Hogsett, Tyreke Baker, Trevour Webb, and Austin Mack sue Defendants Oklahoma Attorney General John O'Connor and Oklahoma County District Attorney David Prater in their official capacities for violations of the First and Fourteenth Amendments to the United States Constitution.

**INTRODUCTION**

2.      This is a facial challenge under 42 U.S.C. § 1983 to the Oklahoma Riot Statute, 21 Okla. Stat. § 1311 ("Oklahoma Riot Statute"). Section 21-1311[1] defines "riot" as "[a]ny use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law." Section 21-1311 is unconstitutionally overbroad and vague: It sweeps far beyond the very limited and narrow true threats exception to the First Amendment right to freedom of speech, thereby subjecting non-violent protesters to criminal liability for exercising their constitutionally protected rights to speech and assembly. Moreover, Section 21-1311 fails to put would-be protesters on notice as to what conduct is likely prohibited. The inevitable effect of Section 21-1311 is to chill core political speech that is the bedrock of our democracy and long protected by the United States Constitution.

3.      Since the fight for racial equity intensified after George Floyd's murder, Oklahoma has relied on Section 21-1311's longstanding provisions to attack these movements on the discriminatory bases of both content and viewpoint.

4.      Section 21-1311 has succeeded in chilling speech. Plaintiffs Terry, Hogsett, Baker, Nabors, Webb, and Mack are Oklahoma residents who often took leadership roles in social activism and peaceful protest focused on social and racial justice. Plaintiff Baker is a journalist who documents and reports on social movements in Oklahoma. Plaintiffs are fearful that they risk criminal liability for speaking out and advocating for change. All

---

[1] 21 Okla. Stat. § 1311.

Plaintiffs have previously faced Incitement to Riot charges for protected expressive conduct and speech while engaged in activism and protesting. They reasonably fear that similar charges may be levied against them under Section 21-1311 for protected activity in part because the state has signaled that it is prepared to increase and expand its unconstitutional prosecution of racial justice protesters through the Oklahoma Legislature's passage of House Bill 1674 ("H.B. 1674").

5.     In 2021, the Oklahoma Legislature passed H.B. 1674, which created additional criminal charges under Section 21-1311's definition of "riot," In particular, H.B. 1674 criminalized "obstruct[ing] the normal use of any public street" by "render[ing] passage unreasonably inconvenient,"[2] granted legal immunity to drivers who hurt or kill pedestrians while in the process of "fleeing" from a riot,[3] and imposed fines of up to $50,000 on groups or organizations deemed conspirators with those violating state laws regulating riots and unlawful assemblies.[4]

6.     An Oklahoma federal court preliminarily enjoined H.B. 1674 last year, upon finding that other provisions of the statute were unconstitutionally vague.[5] In arguing against the preliminary injunction, Oklahoma asserted that H.B. 1674 should be construed

---

[2] H.B. 1674, 2021 Leg. Assemb., Reg. Sess. (Okla. 2021), § 1.
[3] *Id.* § 2.
[4] *Id.* § 3 (referencing 21 Okla. Stat. §§ 1311–1320.5, 1320.10); *see also* Carmen Forman, *Judge Temporarily Blocks Parts of New Oklahoma Law Limiting Protests, Protecting Drivers*, The Oklahoman(Oct. 27, 2021), https://www.oklahoman.com/story/news/2021/10/27/oklahoma-law-allowing-drivers-to-hit-protesters-temporarily-blocked/8574281002/.
[5] *Okla. State Conf. of the NAACP v. O'Connor*, No. CIV-21-859-C, 2021 WL 4992754, *5–6 (W.D. Okla. Oct. 27, 2021).

to only apply to activities constituting riot. The problem, of course, is that the statutory definition of riot that underpins the entire law is unconstitutional. As long as Section 21-1311 remains on the books, Oklahoma will continually attempt to cure vagueness challenges by limiting statutes to an equally vague and overbroad definition of riot.

7.      While these new provisions have been preliminarily enjoined, the unconstitutional definition of riot remains and determines the scope of all seven riot-related charges in existence before 2021 – and still in existence today – including Riot;[6] Unlawful Assembly;[7] Warning to Disperse, Remaining After;[8] Presence After Unlawful Purpose Becomes Known;[9] One Refusing Aid in Arrest Deemed Rioter;[10] Resisting Execution of Legal Process;[11] and Incitement to Riot,[12] the riot charge Plaintiffs faced as a result of their expressive conduct. Indeed, since the fight for racial equity intensified after George Floyd's murder, Oklahoma has relied on Section 21-1311's longstanding provisions to attack these movements on the discriminatory bases of both content and viewpoint.

8.      Notwithstanding their fear of future prosecution under Oklahoma's unconstitutional Riot Statute, Plaintiffs continue their activism and participate in protests. While Plaintiffs continue to engage in protected political speech, their previous prosecution and fear of subsequent prosecution under the Riot Statute has fundamentally changed how

---

[6] 21 Okla. Stat. § 13201.1.
[7] *Id.* § 1320.3.
[8] *Id.* § 1316.
[9] *Id.* § 1317.
[10] *Id.* § 1318.
[11] *Id.* § 1319.
[12] *Id.* § 1320.2.

they protest. Plaintiffs no longer play leadership roles in protests. Nor do they speak from the streets, lead chants or marches, or engage in any dialogue with police officers. They do not engage in expressive activity that could draw attention to themselves for fear they will again face felony criminal charges for lawfully protesting. Until declared unconstitutional and enjoined, the Statute will harm Plaintiffs by forcing them to choose between forgoing the exercise of their constitutional rights or facing the possibility of criminal charges for exercising those rights.

9.      The definition of riot at the core of the Riot Statute must be struck down in its entirety to avoid the rights violations that Plaintiffs have suffered and will suffer without action from this Court.

10.     Because Section 21-1311 violates the First and Fourteenth Amendments to the United States Constitution, this Court should declare the Statute unlawful and preliminarily and permanently enjoin Defendants from enforcing it.

**JURISDICTION AND VENUE**

11.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violation of civil rights under the First and Fourteenth Amendments to the United States Constitution.

12.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question) and § 1343(a)(3) (civil rights violation). Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively; by Rules 57 and 65 of the Federal Rules of Civil Procedure, respectively; and by the general legal and equitable powers of this Court. Plaintiffs' claim for nominal damages is authorized by 42 U.S.C. § 1983.

13.    Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b). Based upon information and belief, a substantial part of the events or omissions complained of and that give rise to, or that will give rise to, the claims herein occurred within this district and division and because the Defendants are located in this judicial district. Defendants are sued in their official capacities. Each Defendant resides within the State of Oklahoma.

## PARTIES

**Plaintiffs**

14.    Plaintiffs are all young people who grew up in Oklahoma City aware of the culture of police violence, especially towards Black and Brown people.

15.    Plaintiff Sincere Terry is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

16.    Sincere Terry is a twenty-year-old Black woman who has lived in Oklahoma City her entire life. Terry has been involved in community advocacy since she was twelve years old, when she attended protests arising out of the killing of Trayvon Martin in 2012 in Florida.

17.    Plaintiff Mia Hogsett is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

18.    Mia Hogsett is a thirty-three-year-old White and Hispanic woman and was born in Oklahoma City.  She has lived in Oklahoma City on and off for most of her life.

19.    Plaintiff Tyreke Baker is a citizen of the State of Oklahoma currently residing in Midwest City, Oklahoma.

20.     Tyreke Baker is a twenty-three-year-old Black man who resides in Oklahoma City, Oklahoma. Baker is the founder and editor-in-chief of the registered independent news journal "The Black Times." In this capacity, he covers racial justice issues in Oklahoma City and nationally, including abusive tactics by the Oklahoma City Police Department ("OCPD") and police generally that harm communities, particularly communities of color. He is a founding member of the March for Our Rights and the Coalition of Community Leaders.

21.     Plaintiff Preston Nabors is a citizen of the State of Oklahoma currently residing in Mustang, Oklahoma.

22.     Preston Nabors is a twenty-five-year-old Hispanic man who has lived in Oklahoma his whole life. Nabors began protesting police violence and advocating for racial justice after the murder of George Floyd by Minneapolis police.

23.     Plaintiff Webb is a citizen of the State of Oklahoma currently residing in Oklahoma City.

24.     Trevour Webb is a twenty-eight-year-old Black man and has lived in Oklahoma City for 15 years. He is married with three children, including a three-year-old daughter and five-year-old son. Webb has been involved in community activism for approximately 5 years.

25.     Plaintiff Austin Mack is a citizen of the State of Oklahoma currently residing in Oklahoma City, Oklahoma.

26.     Austin Mack is a twenty-six-year-old Black man. Mack began protesting police violence and advocating for racial justice after the murder of George Floyd by Minneapolis police.

**Defendants**

27.     Defendant John O'Connor is the Attorney General of the State of Oklahoma. He is sued in his official capacity. He serves as the State's chief legal officer. *Cf. id.* § 1391(e)1.[13] Attorney General O'Connor is responsible for enforcement of Section 21-1311 and is, therefore, an appropriate defendant in this case.

28.     Defendant David Prater is the District Attorney of Oklahoma County and is sued in his official capacity. He has the duty to "appear in all trial courts and prosecute all actions for crime committed in the district" that are not prosecuted by the Attorney General. 19 Okla. Stat. § 215.4. District Attorney Prater is responsible for the enforcement of Section 21-1311 and is, therefore, an appropriate defendant in this case.

## STATEMENT OF FACTS

I.      **Vague And Overbroad Riot Statutes Have Been Used to Criminalize Protected Speech.**

29.     The criminalization and silencing of protesters under vague and overbroad riot statutes is not new. Most recently, South Dakota, Florida, and Oklahoma used riot statutes in attempt to silence protests.

30.     In 2016 and 2017, a large group of people gathered near Mandan, North Dakota to protest the construction of the Energy Transfer Partners' Dakota Access

---

[13] *Id.*

Pipeline across the Standing Rock Sioux Reservation. In response, the South Dakota Legislature passed Senate Bill 189 ("S.B. 189"), a Riot Boosting Act targeting protesters of the pipeline and exposing them to criminal liability for protected conduct.[14]

31.    In response to the murder of George Floyd by Minneapolis police in 2020, Americans across the country took to the streets to protest police brutality and increased their calls for advancing racial justice throughout all sectors of society. A multiracial coalition of millions of people engaged in racial justice demonstrations, making the 2020 protests among the most significant mass movements in the country's history.

32.    The Florida Legislature responded by passing House Bill 1, a comprehensive anti-protest bill including a new definition of riot and additional riot-related criminal charges which criminalize protected conduct.[15] The Oklahoma Legislature responded by passing H.B. 1674, an anti-protest bill which added various riot-related crimes criminalizing protesters for conduct protected by the First Amendment.

33.    In all three states, protesters, advocates, and racial justice organizations challenged the constitutionality of the anti-protest bills criminalizing protesters through broad riot statutes. In all three cases, federal courts preliminarily enjoined the challenged amendments as unconstitutionally vague and overbroad in violation of the plaintiffs' Fourteenth and First Amendment rights. *Dakota Rural Action v. Noem,* 416 F. Supp. 3d 874, 880 (D.S.D. 2019); *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238 (N.D. Fla.

---

[14] S.B. 189, 2019 Leg. Assemb., 94th Sess. (S.D. 2019).
[15] H.B. 1, 2021 Leg. Assemb., Reg. Sess. (Fla. 2021).

2021); *Oklahoma State Conf. of NAACP v. O'Connor*, No. CIV-21-859-C, 2021 WL 4992754 (W.D. Okla. Oct. 27, 2021).

34.     Oklahoma went a step farther. In addition to passing unconstitutional anti-protest bills enhancing riot statues, the state of Oklahoma used the existing riot statute at issue here to charge protesters with incitement to riot for saying "Fuck the Police!" to an Oklahoma City police officer. Such unconstitutional charges were a direct result of the overbroad and vague nature of Oklahoma's underlying riot statute.

## II.     Oklahoma's Riot Statute Can and Has Been Used to Criminalize Protected Speech With Which the State Disagrees.

### A. George Floyd Oklahoma City Protests

35.     Hundreds of Oklahomans joined the international calls for racial justice and an end to police brutality following the murder of George Floyd. In Oklahoma City, a grassroots protest began on the intersection of Classen Boulevard and 23rd Street in the evening of May 30, 2020.[16] Plaintiffs Terry, Hogsett, Webb, and Mack were present at the protest on May 30, 2020. They each protested peacefully from the streets throughout the action. They marched in the streets alongside the other protesters and participated in chants.

36.     By nightfall, the protesters marched south down Classen Blvd. to end in front of the OCPD Headquarters where Oklahoma City police officers in riot gear stood

---

[16] Ben Felder (@benfelder_okc) Twitter (May 30, 2020, 7:23PM), https://twitter.com/benfelder_okc/status/1266888046592606208.

between protesters and the building.[17] Protestors and Plaintiffs frequently held their hands up and chanted "Hands up, don't shoot;" as well as "not one more, how many more;" "no justice, no peace;" and "Fuck the Police." Some protestors and Plaintiffs held signs that read "Stop Killing Black People," "Black Lives Matter," and "Say Their Names."

37.     Tensions intensified around 11:30 pm, with some protesters – but not Plaintiffs – throwing water bottles toward OCPD officers, setting off fireworks, jumping on and setting fire to an Oklahoma City police car, and breaking the windows of the first floor of the Oklahoma County Jail and a nearby bail bonds company. While this occurred, the majority of protesters continued to protest peacefully. In response, OCPD deployed tear gas and shot bean bag rounds directly at protesters to disperse the crowd.[18]

38.     Protesters remained until the morning hours of May 31, 2020. OCPD continued deploying tear gas and shooting bean bag rounds into the crowd long after all instances of property damage had ceased and into the morning hours of May 31, 2020.[19] Plaintiff Hogsett and Mack stayed until the early morning hours of May 31, 2020.

---

[17] Hicham Raache, *Black Lives Matter Protest in Oklahoma City Demanding Justice for George Floyd*, KFOR News (May 30, 2020), https://kfor.com/news/black-lives-matter-to-hold-protest-in-oklahoma-city-demanding-justice-for-george-floyd/.

[18] Nuria Martinez-Keel, *'Fighting for our Lives': Hundreds Protest in Oklahoma City Against Police Killings*, The Oklahoman (May 31, 2020), https://www.oklahoman.com/story/news/columns/2020/05/31/fighting-for-our-lives-hundreds-protest-in-okc-against-police-killings/60398330007/.

[19] Reese Gorman, *Riots Erupt Overnight in Oklahoma City in Protest of George Floyd Incident*, Norman Transcript (May 31, 2020), https://www.normantranscript.com/news/riots-erupt-overnight-in-oklahoma-city-in-protest-of-george-floyd-incident/article_06ea9cf8-a344-11ea-922a-2bd4bed7b042.html.

39.     Plaintiff Mack was hit by a bean bag round while lawfully protesting. He witnessed OCPD hit an additional four or five protesters with bean bag rounds. OCPD also hit Plaintiff Mack with tear gas, burning his skin and numbing his face. He witnessed other peaceful protesters hit with tear gas. He was volunteering as a medic and assisted the injured protesters, pouring milk into their burning eyes to alleviate the symptoms of the tear gas. Other protesters poured milk into Mack's eyes to assist him with the burning tear gas.

40.     Plaintiff Hogsett witnessed OCPD hit a peaceful protester in the ankle with a tear gas canister. Hogsett lunged into the cloud of smoke that erupted around her and the injured protester, pulling the injured protester away from the tear gas.

41.     On the afternoon of May 31, 2020, Black Lives Matter Oklahoma City ("BLM OKC") hosted a protest outside Nappy Roots Bookstore on the corner of 36th and Kelly Avenue. After BLM OKC's planned programing, protesters began marching south down Kelly Avenue to the Capitol and then farther south back to OCPD Headquarters, where they were again met with OCPD officers in riot gear.[20] The crowd steadily grew, and OCPD officers pepper sprayed several peaceful protesters near the front of the protest.

42.     Plaintiffs Terry, Hogsett, Baker, Webb, and Mack were present at the protest on May 31, 2020. Plaintiff Baker filmed and documented the event. All Plaintiffs

---

[20] *Overnight Curfew Issued for Part of Downtown OKC After Protests Intensify*, KOCO News (Jun. 1, 2020), https://www.koco.com/article/protesters-rally-in-okc-for-second-day-of-demonstrations-in-response-to-george-floyds-death/32723204.

protested peacefully throughout the action. Plaintiff Hogsett passed out water to protesters. Plaintiffs marched down the center of the street with the other protesters and participated in chants.

43.     At 9:43 pm, Mayor David Holt issued a state of emergency and set a curfew to go into effect at 10:00 pm. [21] At 10:00 pm, OCPD deployed tear gas and bean bag rounds directly into a peaceful crowd of protesters.

44.     Plaintiff Baker was surrounded by tear gas while lawfully protesting, feeling trapped by its burning cloud of smoke. Plaintiff Webb was also caught in the tear gas and was forced to get medical care.

45.     Plaintiff Terry stood at the front of the protest. OCPD hit her with tear gas, causing her to fall to the ground and feel like her insides were closing up. She witnessed OCPD hit other peaceful protesters with tear gas, causing them to fall to the ground gasping for air. The peaceful protesters hit included mothers and their small children. Around Plaintiff Terry, babies cried from inhaling tear gas. The tear gas left a rash all over Plaintiff Terry's body, lasting for several days.

46.     Protesters, including Plaintiffs Terry and Mack, remained until the morning hours of June 1, 2020, as OCPD continued to use tear gas and bean bag rounds to disperse the crowd.

47.     On June 1, 2020, protesters again marched downtown outside OCPD Headquarters. The protest was peaceful. Yet, OCPD pointed their guns at protesters.

---

[21] City of OKC (@cityofokc), Twitter (May 31, 2020, 9:43pm), https://twitter.com/cityofokc/status/1267285730658828290.

OCPD did not deploy tear gas or rubber bullets during this protest, but tear gas cannons were visible and within reach of the police to use.

48.    Plaintiffs Baker, Mack, Nabors, Terry, and Webb were all present at the June 1, 2020, protest. Plaintiffs continued to protest peacefully from the street in front of OCPD Headquarters.

49.    The afternoon of June 2, 2020, Young Democrats of Oklahoma hosted a vigil in the Myriad Gardens to honor the lives lost during the Tulsa Race Massacre and people who have since lost their lives to police brutality.[22] The event was peaceful, and protesters left the Myriad Gardens at nightfall. Plaintiff Terry attended to help set up. Plaintiffs Nabors and Mack were present throughout the event. All Plaintiffs protested peacefully throughout the action.

50.    The evening of June 2, 2020, protesters returned outside OCPD Headquarters in smaller numbers than the two previous nights. The protest was peaceful, and people called on Mayor Holt to come and speak to them. Around 9:45 pm, Mayor Holt lifted the curfew, which had been set to recommence at 10:00 pm. Around 11:00 pm, Mayor Holt came to speak with the peaceful protesters to begin a dialogue and hear their concerns.[23] Plaintiff Terry engaged Mayor Holt in a dialogue for a significant portion of the evening.

---

[22] Young Democrats of Oklahoma, *Peaceful in the Park*, Facebook (Jun. 2, 2020), https://www.facebook.com/events/602649663681884.

[23] *Mayor Holt Joins Protestors in Downtown OKC Late Tuesday*, The Oklahoman (Jun. 2, 2020), https://www.oklahoman.com/story/news/politics/2020/06/03/demonstrators-rally-in-okc-for-fourth-night/60397781007/.

51.    Plaintiffs Terry, Baker, Nabors, and Mack were present at the protest on June 2, 2020. Plaintiff Baker filmed and documented the event. All Plaintiffs protested peacefully throughout the action. All Plaintiffs protested in the middle of the streets around OCPD Headquarters, along with the other protesters.

B.  A New Generation of Activists

52.    The evening of June 3, 2020, a smaller group of about thirty protesters gathered outside OCPD Headquarters, including all Plaintiffs. The group was comprised almost entirely of young people who had been protesting in front of OCPD Headquarters nearly every night since May 30, 2020. The protesters gathered on June 3, 2020, were not a part of any formal organization, and most had not met one another before. As their numbers decreased from hundreds to a couple dozen, relationships began to form. They began referring to themselves as "The Movement," seeking to embody an intersectional movement for justice for all peoples and focusing on demands for police accountability and an end to police brutality. A new generation of activists was born.

53.    People, including all Plaintiffs, gathered downtown nightly around 7:00 pm to protest in front of OCPD Headquarters through the evening and often into the early hours of the morning around 7:00 am. They would march through the streets around the OCPD Headquarters. Barricades were placed around OCPD Headquarters with OCPD officers stationed at intervals around the building. Some protesters would yell to the officers their frustrations and others attempted to engage them in dialogue. A few successfully in began a dialogue with OCPD officers and began to build relationships.

15

54.     Plaintiff Baker, who had been documenting the George Floyd protests in Oklahoma City, started The Black Times, a digital news company, to accurately document the grassroots movement for police accountability and racial justice in Oklahoma City. He attended the nightly protests as a journalist.

55.     These nightly protests occurred from June 3, 2020, through June 25, 2020. All Plaintiffs were present at the protests every night. Plaintiffs Terry, Hogsett, Webb, and Nabors often led chants, including, "A city united will never go divided," "Racist cops have to go," and "Hands up, don't shoot." Plaintiff Terry frequently spoke to the crowd and led chants over a megaphone.

56.     On June 7, 2020, Plaintiff Mack organized a community barbeque in Oklahoma City as a continued demonstration in opposition to police violence and in support of Black lives.

57.     The members of The Movement were inspired by the murals in support of Black lives and racial justice painted in cities across the country and decided to paint their own mural, as the nation-wide demand for police accountability and racial justice in the wake of George Floyd's murder by police continued. Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb were involved with the planning of the mural, seeking to create a community event to embody unity and solidarity. The mural was designed by Elizabeth Shilling, an artist with HeartLocke Studio, and was planned to run the length of Shartel Avenue between West Main Street and Colcord Drive, abutting police headquarters. The mural would depict a series of flags honoring Black Lives and symbolizing solidarity, community, and shared struggles, including the Black Liberation Flag, Native American

16

Flag, and the Rainbow Pride Flag. On June 22, 2020, Brandon Riles, another protester present during the nightly protests outside OCPD Headquarters, secured a permit from Oklahoma City for the mural along Colcord Dr. between Shartel Ave. and Main St., in front of OCPD Headquarters and the Oklahoma County Jail. Oklahoma City employees set up barricades to block off the permitted space for the mural along Colcord Dr. on or around June 20, 2020.

58.    Painting began around June 21, 2020. Painters would arrive around 9:00 or 10:00 am and leave the area around midnight from around June 21, 2020, through June 23, 2020. Around thirty community members came out each day to help, including children and families. The atmosphere was light, with music playing, people dancing, and pizza delivered. Community members would play "Fuck tha Police" by N.W.A. and other songs critical of the police over a speaker as people painted. On occasion, painters would hold up their fists or middle fingers toward OCPD Headquarters in a sign of protest. From inside, officers were standing, observing, and filming the painters.

C.  The Mural Incident

59.    On the afternoon of June 23, 2020, around 2:30 pm, Plaintiff Nabors moved one of the barricades from the south side of the intersection of Colcord Dr. and Shartel Ave. to the north side of the intersection, with the belief that he was moving the barricade to reflect accurately the bounds of the permit. A few minutes later, OCPD Master Sergeant Nicklas Wald ("Sgt. Wald") drove up in a police cruiser to the city barricade blocking off the street for the mural. Sgt. Wald exited his vehicle and moved one of the barricades further into the intersection to allow him to turn onto Colcord. Plaintiff Baker

saw the police cruiser drive up while he was filming the mural project from a distance and ran to see what was happening. Plaintiff Nabors saw Sgt. Wald move the barricade and approached Sgt. Wald to tell him that he could not drive through the permitted section of the street. Sgt. Wald returned to his vehicle.

60.    Plaintiff Nabors yelled several times to the officer that he could not move the barricades and instructed him to turn around. Nabors told the officer, "You are blatantly violating the law." Plaintiff Baker was filming. Plaintiffs Terry, Hogsett, and Webb approached as the officer continued to attempt to turn onto Colcord.

61.    Plaintiffs Terry, Hogsett, Nabors, and Webb stood in front of the police cruiser to block his path forward. At no time did they surround the vehicle or impede its exit up Shartel Ave. Plaintiffs Nabors and Webb raised their fists. Plaintiffs Hogsett and Baker filmed the encounter on their phones. Plaintiffs Terry and Hogsett yelled, "Fuck the police!", "We have a permit!", and "This is a city ordinance!" The Plaintiffs called out Sgt. Wald's badge number. Plaintiff Webb moved to the driver's side of the vehicle and asked Sgt. Wald to "just back up," and "just go around the block." The officer moved his car slowly forward, toward the Plaintiffs and stopped the car about an inch from Plaintiff Terry's legs. Plaintiff Terry yelled, "Hit me if you want to!"

62.    Brandon Riles approached and showed Sgt. Wald a copy of the permit. After reviewing the permit, Sgt. Wald backed up, turned around, and drove away up Shartel Ave. Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb ran after the cruiser for a few seconds but did not impede its path out. As the cruiser drove away, Plaintiff

18

Hogsett yelled, "Now who got a mother fucking barricade!" At no time did any Plaintiff threaten Sgt. Wald. Plaintiff Baker filmed the entire encounter.

63.     Most of the mural painters present at that time continued to paint peacefully while this encounter took place. Once Sgt. Wald drove away, Plaintiffs Terry, Hogsett, Baker, Nabors, and Webb returned to painting the mural.

64.     The morning of June 24, 2020, Plaintiffs sought to file a complaint with OCPD about the way they were treated by the OCPD officer the previous day. Plaintiffs Terry, Hogsett, Baker, and Miracle Parks, another member of The Movement, arrived outside OCPD Headquarters around 10:00 am. They walked through the first set of doors into the vestibule to find that the second set of doors into the building were locked. Plaintiff Hogsett pushed the buzzer to alert the OCPD officer present at the front desk inside that Plaintiffs were there and would like to come in. Plaintiff Hogsett began live streaming. Through the speaker on the buzzer, Plaintiff Hogsett told the officer at the front desk that they would like to come inside to file a complaint against Sgt. Wald. The officer instructed them to call 911 to lodge their complaint, explaining that the building was closed to visitors due to COVID-19.

65.     Plaintiffs Terry, Hogsett, and Baker called 911 as instructed but were told by the operator that 911 does not accept complaints and that they should file their complaint at OCPD Headquarters in person.

66.     Plaintiff Hogsett again pushed the buzzer to speak to the officer at the front desk, who again refused them entrance. A back-and-forth ensued, with the officer continuing to deny them entrance. Several other civilians walked past Plaintiffs Terry,

19

Hogsett, and Baker and were let inside without issue. Plaintiffs asked these individuals whether they had appointments with OCPD. All said they did not. Plaintiffs attempted to follow one person in, but an officer closed the door behind them and continued to refuse Plaintiffs entrance.

67. After around forty minutes of attempting to gain access to the building to file a complaint, Plaintiffs Terry, Hogsett, and Baker became angry and frustrated and began yelling through the doors that they were there to file a complaint. Plaintiff Baker called Plaintiff Nabors to notify him of the situation. The officer at the front desk called several other officers to the front of building near the entrance.

68. Plaintiff Nabors arrived in the vestibule.

69. The newly-arrived officers opened the doors to speak to Plaintiffs Terry, Hogsett, and Baker but stood in the doorway to block their entrance into the building. Plaintiffs Terry and Hogsett yelled that they were trying to file a complaint and demanded to be let inside.

70. The exchange went on for about two minutes before one of the officers arrested Miracle Parks, as she repeated "I just want to talk."

71. In frustration at her friend's arrest and at being denied entry at this point for about an hour, Plaintiff Hogsett yelled from the vestibule, "I'm gonna burn this motherfucker to the ground!" She did not have a lighter, lighter fluid, gasoline, or any other apparent means to act on her statement. She was wearing a dress without pockets and could be clearly observed to not have any means to start a fire. Her statement was political hyperbole made in frustration. Plaintiffs Baker told her not to make such

20

statements. Plaintiff Terry grew concerned about the response of the police and turned to leave. One officer grabbed Plaintiff Terry by the arm and arrested her.

72. The officers then invited Plaintiffs Hogsett and Baker inside to talk, where they were asked to sit on benches in the lobby. As they walked in, one officer told them, "We know who you are" and "We've seen your pictures and videos." One officer asked Plaintiff Baker if he was "the kid that's always recording?" The officer seized his phone.

73. Plaintiff Nabors was not brought into the building and left.

74. After a few moments, officers arrested Plaintiffs Hogsett and Baker for disorderly conduct. Officers standing on the upper floors of the building looked down into the lobby and applauded.

75. Plaintiff Terry spent approximately ten hours in the Oklahoma County Detention Center before being released on her own recognizance.

76. Plaintiff Hogsett spent approximately fifteen hours in the Oklahoma County Detention Center before being released on bond.

77. Plaintiff Baker spent approximately ten hours in the Oklahoma County Detention Center before being released on his own recognizance.

### III. The State's Use of The Riot Statute to Criminalize Protesters Immediately Chilled Protected Speech.

A. Isaiah Lewis Protest

78. On June 26, 2020, all Plaintiffs attended a protest in Edmond to protest Defendant Oklahoma County District Attorney David Prater's failure to charge the officers who shot and killed Isaiah Lewis, a Black 17-year-old, in 2019 while he was

experiencing a mental health crisis. The protest began around 6:00 pm in the intersection in front of the Edmond Police Department. Around 150 people attended the protest.

79.     All Plaintiffs protested in the middle of the intersection, helping to ensure vehicles did not drive through and leading chants like, "Black lives matter," "Hands up, don't shoot," and "Say their names." Plaintiffs Terry, Nabors, and Mack spoke over a megaphone to lead chants. Plaintiff Mack led the singing of an old spiritual, "Ain't Gonna Let Nobody Turn Me Around." Plaintiff Hogsett left to get pizza for the protesters. Plaintiff Baker was documenting the protest and interviewing protesters with the intention of making a documentary.

80.     After about an hour, Plaintiffs Nabors and Mack began speaking to other attendees about marching around the police station and onto 2nd Street, the nearest main street to the station. After the plan was communicated to the other protesters and just before people, led by Plaintiffs Nabors and Mack, were about to move the protest toward 2nd St., Plaintiff Nabors received a call from Jess Eddy, another racial justice activist and organizer, notifying him of a news article about charges just brought by Defendant Prater against protesters for their activities during the George Floyd protests.

81.     Most of the charges related to activities on the large protests of May 30 and 31, 2020. They included five Terrorism, five Riot, and seven Disorderly Conduct charges as well as arson and assault and battery. All Plaintiffs were charged with Incitement to Riot.[24]

---

[24] 21 Okla. Stat. § 1320.0 ("It shall be unlawful and shall constitute incitement to riot for a person or persons, intending to cause, aid, or abet the institution or maintenance of a

82.     News of the charges spread quickly through the protest. Attention immediately turned from protesting to finding out as much information as possible about the charges. Panic fell over the crowd. Plaintiff Baker's interviews were cut off by the news. Plaintiff Hogsett returned with pizza to learn of the charges. Now facing Incitement to Riot charges, all Plaintiffs left the protest. With so many of the protest leaders gone and the energy turned from protest to panic, all other protesters quickly dispersed.

83.     The Movement's protests in front of OCPD Headquarters, which had occurred every night for nearly a month, ended the day the Defendant Prater brought Incitement to Riot charges against the Plaintiffs.

B.  Criminal Prosecution

84.     Defendant Prater was quoted in a June 27, 2020 article in *The Oklahoman*, stating, "This is not Seattle . . . . We're not putting up with this lawlessness here." The article reported that, "Oklahoma County District Attorney David Prater made the decisions himself on the charges in a get-tough approach meant to deter others from going too far during protests in the future."[25] Regarding the Incitement to Riot charges,

---

riot, to do an act or engage in conduct that urges other persons to commit acts of unlawful force or violence, or the unlawful burning or destroying of property, or the unlawful interference with a police officer, peace officer, fireman or a member of the Oklahoma National Guard or any unit of the armed services officially assigned to riot duty in the lawful performance of his duty.")

[25] Nolan Clay, *Some OKC Protestors Charged with Terrorism, Rioting, Assault*, The Oklahoman (Jun. 27, 2020), https://www.oklahoman.com/story/news/columns/2020/06/27/protesters-charged-with-terrorism-rioting-assault/60394429007/.

Defendant Prater later said that he was "angry" and pissed off" at the things that the protesters said to Officer Wald.

85.    The Incitement to Riot charges against Plaintiffs arose from their encounter with Sgt. Wald during the mural painting.

86.    The U.S. Marshal Service was brought in to effect Plaintiffs' arrests. Warrants were issued for their arrest, with bail set at $200,000 each. The Oklahoma County bail schedule lists a $15,000 bail for Oklahoma residents charged with a felony.

87.    Plaintiff Terry could not afford a $200,00 bail. She spoke with an attorney and turned herself in on July 1, 2020, when she learned BLM OKC intended to post her bond. Terry was taken into custody and incarcerated in the Oklahoma County Detention Center for two or three days.

88.    On July 2, 2020, Terry moved to reduce her bond to $15,000, consistent with the bail schedule. Her motion was denied. BLM OKC posted the amount in full, and she was released.

89.    On June 30, 2020, Plaintiff Hogsett was also charged with Threatening An Act of Violence for her comment about burning OCPD Headquarters, with an additional bail amount of $200,000. She could not afford a $400,000 bail. The same day, U.S. Marshals came to Hogsett's apartment to arrest her. The Marshals entered the apartment with guns drawn and searched the apartment. One Marshal slammed Hogsett's roommate up against a wall. Hogsett was not home. After the Marshals left, Hogsett's roommate called her to tell her that the Marshals were looking for her. Fearing for her safety, Hogsett turned herself in to the police on June 30, 2020.

90. On July 2, 2020, Plaintiff Hogsett was arraigned and entered a plea of not guilty on both charges. She was incarcerated in the Oklahoma County Detention Center following her arraignment. On July 2, 2020, Hogsett moved to reduce her $400,000 bond to $17,000, consistent with the bail schedule. Her motion was denied. On July 7, 2020, BLM OKC posted the bail amount in full, and she was released.

91. Plaintiff Baker could not afford a $200,000 bail. On or about June 30, 2020, approximately twenty-five U.S. Marshals came to Baker's mother's home with guns drawn demanding to know Baker's whereabouts. Baker was not home, and the Marshals left when Baker's mother insisted that she did not know where he was.

92. On July 1, 2020, Baker turned himself in. The same day, BLM OKC posted the bail amount in full, and he was released.

93. Plaintiff Nabors could not afford a $200,000 bond. On or about June 30, 2020, ten to fifteen U.S. Marshals came to Nabor's father's house, where he had been staying. Nabors was not home, but, after learning the Marshals had been to his father's house, Nabors feared for his safety and the safety of his family and friends. He turned himself in on June 30, 2020.

94. Plaintiff Nabors was arraigned on July 2, 2020 and pled not guilty. Nabors moved to reduce his bond. His motion was denied. On July 7, 2020, BLM OKC posted the bail amount in full, and he was released.

95. Plaintiff Webb could not afford a $200,00 bail. On June 30, 2020, fifteen to twenty U.S. Marshals came to his front door, guns drawn. Webb answered the door in just his underwear. The Marshals searched his house and instructed him to crawl on

hands and knees onto the front porch and onto the lawn. Webb was not allowed to put on clothes or shoes. He was handcuffed and taken to the Oklahoma County Detention Center.

96.    On July 2, 2020, Webb was arraigned and pled not guilty. He was detained following his arraignment. On July 7, 2020, Webb moved to reduce his bail to $5,000, an amount more in line with the bail schedule. His motion was denied. The same day, BLM OKC posted the bail amount in full, and he was released.

97.    Plaintiff Mack could not afford a $200,000 bond. He spoke with an attorney who called Defendant Prater several times to explain that Mack had been erroneously charged because he was not present at the time of the incident with Sgt. Wald. Prater stated he did not believe that was true. Mack provided video footage of himself at the gym at the exact time of the encounter with Sgt. Wald, at which point Prater was forced to admit that Mack was not present at the mural incident.

98.    On June 30, 2020, the warrant was amended to remove Plaintiff Mack and replace him with Plaintiff Webb. Other than the fact that they are both Black men, Mack and Webb bear no resemblance. Mack is 6'1, while Webb is 5'8 tall. Mack has a darker skin tone and is more muscular than Webb.

99.    On July 1, 2020, Plaintiff Mack learned BLM OKC intended to post his bond. He went to the jail to turn himself in the same day but was not taken into custody because he was able to prove he was not present during the mural incident with Sgt. Wald. The warrant had been recalled.

100.    On October 12, 2020, Plaintiffs Terry, Hogsett, Webb, Nabors, and Baker pled guilty to a lesser charge of misdemeanor Obstruction of an Officer. Plaintiff Hogsett also pled guilty to a misdemeanor charge of Threatening to Perform an Act of Violence. They each received a two-year deferred sentence, unsupervised probation, and court costs.

C.  Incitement to Riot Affidavits

101.    The Incitement to Riot affidavits and application for arrest of Plaintiffs makes factually inaccurate claims about Plaintiffs' conduct and cites to protected speech as forming the basis of probable cause.

102.    The Incitement to Riot Affidavit and Application for Arrest for Plaintiff Terry alleges that she ran up along the right side of Sgt. Wald's car and blocked him from proceeding, "screaming that the officer hit her to incite actions by others." Rather, Terry stood in front of Sgt. Wald's car to block his path forward through the area of the street that had been permitted for mural painting. When Sgt. Wald moved his car forward to an inch from Terry's legs, she yelled, "Hit me if you want to." At no time did Terry encourage other painters to come over.

103.    The affidavit alleges that Terry was "screaming at Wald, saying 'Fuck the Police!'" The affidavit says that Terry "continued to stand in front of the car and yell and point at the car" as if to "incite an incident between Wald and the group." The affidavit says, as Sgt. Wald backed up his car, Terry followed the car screaming, "Fuck the Police!"

104.    The Incitement to Riot Affidavit and Application for Arrest for Plaintiff Hogsett alleges that she ran up from Sgt. Wald's right side and blocked his vehicle and that Hogsett was "getting the crowd worked up for an encounter with Wald." No evidence shows that Hogsett or anyone else "worked up" anyone due to the encounter. The affidavit says Hogsett pursued the car as Sgt. Wald backed up and drive away, screaming "Fuck the Police!"

105.    The Incitement to Riot Affidavit and Application for Arrest for Plaintiff Baker alleges that he stood in the roadway to stop Sgt. Wald's car from proceeding and filmed the incident. The affidavit states that Baker "prevented Wald from conducting his official business by blocking his path but also escalated the situation by calling others." No evidence shows that Baker called others. The affidavit states that Baker continued to film the encounter as Sgt. Wald's car backed away.

106.    The Incitement to Riot Affidavit and Application for Arrest for Plaintiff Nabors alleges that he "prevented Wald from conducting his official business but also escalated the situation by calling others." No evidence shows that Nabors called others. The affidavit states that Nabors joined others in front of the car, yelling and pointing.

107.    The Incitement to Riot Affidavit and Application for Arrest for Plaintiff Webb states that Webb had been seen earlier that day raising his fist and refers to unnamed people making "different hand gestures at the [police] building." The affidavit states that, as Sgt. Wald backed away, Webb was "screaming 'Fuck the Police!'"

108.    The bases for Plaintiffs' arrest amounts to (1) inaccurate allegations that they surrounded Sgt. Wald's car and encouraged others to join – they did neither – and

(2) that they engaged in the protected conduct of filming an officer and yelling "Fuck the Police!"

109.    Two protesters were arrested on charges of Incitement to Riot for activity during the May 30 and 31, 2020 protests. The Affidavits Of Probable Cause for Malachai Davis and James Holt rely on the protected expressive and political conduct of "the crowd . . . standing in the street," protesters "carrying flags that were identified as belonging to the following groups: ANTIFA, Soviet Union (Communism), American Indian Movement, Anarcho-Communism (solid red), and the original Oklahoma flag (red with '46' inside a star) (currently adopted by Oklahoma Socialists)," and protesters carrying "a variety of hand made signs that supported ANTIFA, Black Lives Matter, reproductive justice, George Floyd, anti-police and anti-government positions."

D. Chilled Speech

110.    The Movement's nightly protests ended the very night Plaintiffs were charged with Incitement to Riot. Nearly a month of nightly protests outside OCPD Headquarters from 7:00 pm to around 7:00 am, organized and led by Plaintiffs, abruptly came to a halt.

111.    The charges ended a protest in real time, as Plaintiffs learned about their charges while protesting another police killing.

112.    When Plaintiffs did protest after their charges, they did so in a fundamentally different manner, no longer taking leadership roles or making themselves visible. They now stay out of the streets, remaining on sidewalks. They do not lead marches. They no longer speak over megaphones. They do not lead chants. They do not

engage in dialogue with police officers. All Plaintiffs have limited their speech and changed the way they protest out of fear of arrest and prosecution.

113.    On August 3, 2020, Plaintiff Terry participated in a rally outside the Oklahoma County courthouse to protest cash bail and Defendant Prater's decision to criminally charge protesters. Participants entered the courthouse to stage a sit-in of Defendant Prater's office, demanding that he drop the charges. Out of fear of additional arrest and prosecution, Plaintiff Terry remained outside the courthouse while other protesters went inside.

114.    On September 23, 2020, Plaintiff Hogsett attended a protest of the "not guilty" verdict for the officers who shot and killed Breanna Taylor, a Black woman shot and killed in her apartment by Louisville police during a no-knock raid. She participated in the protest only after the music other protesters were playing took a softer tone, changed from "Fuck tha Police" by N.W.A to "Change is Gonna Come" by Sam Cooke. She stayed on the sidewalk, too afraid to join other protesters in the street.

115.    On December 11, 2020, Plaintiffs Terry, Hogsett, Baker, Nabors, and Mack attended a grassroots protest in response to OCPD officers fatally shooting Bennie Edwards, a 60-year-old Black man. While Plaintiffs feared for their safety, the injustice of the killing motivated them to attend.

116.    Protesters gathered immediately following the shooting, as Edward lay dead in the parking lot where he was shot. During the protest, and as Plaintiffs Terry and Hogsett were standing behind the police line, an OCPD officer moved toward Terry with a baton in hand. Hogsett moved in between Terry and the officer, and the officer struck

Hogsett with a baton. An OCPD officer pepper sprayed Plaintiff Mack directly in his eyes. Another officer pepper sprayed Terry. Plaintiff Baker was present reporting on the shooting and witnessed OCPD spray peaceful protesters with pepper spray. Plaintiffs Hogsett and Mack would not attend another protest for months out of fear for their safety.

117.    In 2021, Plaintiff Hogsett attended several peaceful protests downtown, but stayed on the sidewalk, too fearful to venture into the street. She stayed several blocks away from the protests out of fear of arrest. She did not lead or participate in any chants. On occasion, protesters would see how far away from the protest Hogsett was and would ask her to hold and watch their children as they protested.

118.    Plaintiff Hogsett no longer uses the words "fire" or "burn" or even the fire emoji when posting on social media and does not post anything overtly critical of the police, for fear of arrest and prosecution.

119.    Plaintiff Hogsett will now only attend a protest when she has been assured by the organizers that all permits have been acquired and that it will remain calm. She no longer feels safe attending many protests criticizing the police and fighting for racial justice.

120.    In 2021 and 2022, Plaintiff Terry continued attended protests; however, she is still scared for her safety and that she will be arrested again. She no longer leads chants on the megaphone. She no longer directs the progression or stands in the front of marches. She stays in the back and tries not to draw any attention to herself. Because she believes the state targets protesters who stand out as leaders, Terry tries not to stand out to avoid additional criminal charges.

121.    In November 2021, Plaintiff Mack participated in numerous protests, vigils, and events in support of the commutation of the execution of Julius Jones, a Black man sentenced to death in Oklahoma following an unfair trial littered with systemic bias. He participated cautiously with the knowledge that OCPD officers know his name and face. He did not organize any of the events and did not play any leadership roles for fear of arrest and prosecution.

122.    Plaintiff Baker limits his attendance at protests to events where he knows the organizers out of fear that something unpredictable may happen and the police will arrest him for his presence or for filming. He keeps his distance from police officers whenever he attends a protest. He no longer feels safe attending protests criticizing the police and fighting for racial justice.

123.    Plaintiff Baker elected not to organize the 2022 March for our Rights event, a commemoration of the 1963 march in Washington D.C., out of fear that organizing a march would again make him a target for arrest and prosecution.

124.    Plaintiff Webb continues to protest but does not use a megaphone and does not play a visible role anymore out of fear of arrest and prosecution. He only participates in protests on the sidelines and makes sure to stay away from police. When other protesters say, "Black Lives Matter," he instinctively moves away from them out of fear.

125.    Plaintiff Nabors still participates in protests but does not organize them. He does not speak over the megaphone or lead chants. He does not direct the progression of marches and does not stand near the front of protests. He stays on the sidewalk, afraid that he could be arrested for standing in the street with other protesters. He no longer

speaks to police during protests. He is careful not to take any leadership roles during protests, fearful that being the face of a movement or action will again make him a target for arrest and prosecution.

126.    While Plaintiffs continue to engage in peaceful protesting, they do so not as outspoken leaders but as cautious participants under the ever-present fear of arrest and criminal prosecution.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the First Amendment under 42 U.S.C. § 1983)

127.    Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this Complaint.

128.    All Plaintiffs bring this claim against Defendant O'Connor for declaratory and injunctive relief and against Defendant Prater for injunctive relief.

129.    Defendants deprived, and are continuing to deprive, Plaintiffs of their rights secured to them by the United States Constitution.

130.    By enacting Section 21-1311 and enforcing it against Plaintiffs, Defendants have chilled their speech. In doing so, Defendants have violated, and continue to violate, Plaintiffs' right to free speech and expression, and in particular their right to core political expression, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

131.    The definition of "riot" in Section 21-1311 determines the scope of Plaintiffs' Incitement to Riot charge, which is in part defined as "for a person or persons, intending to cause, aid, or abet the institution or maintenance of a riot."[26]

132.    Under the First Amendment, a statute that proscribes a substantial amount of protected speech in relation to its otherwise legitimate sweep is unconstitutionally overbroad. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973);[27] *see also id.* at 632 n.10 (Brennan, J., dissenting) (citing cases applying overbreadth analysis to statutes chilling expressive conduct as opposed to pure speech).

133.    Relevant to this Statute, the Supreme Court's precedents recognize an exception to the First Amendment's protections where the speaker engages in "true threats." *E.g.*, *Virginia v. Black*, 538 U.S. 343, 359 (2003);[28] *Watts v. United States*, 394 U.S. 705, 708 (1969). True threats exist only where a "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual." *Black*, 538 U.S. at 359. Under the Tenth Circuit test, the speaker must intend for the recipient to feel threatened by the speaker's words. *See United States v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014).

134.    Section 21-1311's definition of criminal riot broadly prohibiting "any threat" is unconstitutionally overbroad, proscribing substantially more speech than is properly characterizable as an unprotected true threat. Section 21-1311 treats "*any* threat" as

---

[26] 21 Okla. Stat. § 1320.2.
[27] *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).
[28] *Virginia v. Black*, 538 U.S. 343 (2003).

sufficient to rise to the level of riot, whether the speech is both a serious expression of intent to commit an act of unlawful violence upon a particular individual, as required by *Black*, or whether the speech is intended to make the recipient of the speech feel threatened, as required under *Heineman*.

135.   A substantial amount of speech would fall within the coverage of "any threat" but not rise to the level of a true threat. For example, a politically hyperbolic statement that one would shoot the president if drafted, *Watts*, 394 U.S. at 708, or a nonliteral threat to kick a trespasser's butt, *Noem*, 416 F. Supp. 3d at 888–89, would fall within Section 21-1311's reach despite the fact that the are constitutionally protected, as would any similar statements. Therefore, it is clear that Section 21-1311 proscribes much more than unprotected true threats.

136.   Additionally, language that is very similar to Section 21-1311's language has already been found overbroad by another district court. South Dakota's riot statute, S.D. Codified Laws § 22-10-1, similarly defined riot as "any threat to use force or violence, if accompanied by immediate power of execution."[29] A district court in the District of South Dakota determined that this language was overbroad because it prohibited protected speech that did not constitute constitutionally proscribable true threats. *Noem*, 416 F. Supp. 3d at 888–89. The *Noem* court explained that a rancher who told the driver of a truck on the rancher's property without permission that he "better get out of here before we kick your butt" could fall within the statute's coverage, even though this statement would likely

---

[29] SDCL § 22-20-01.

constitute protected speech rather than a true threat. *Id.* at 889.[30] Thus, the *Noem* court

found the South Dakota statute's definition of riot overbroad. *Id.* at 884–91.

137.   Importantly, South Dakota's definition is substantively identical to

Oklahoma's definition. In fact, Oklahoma drafted Section 21-1311 relying on South

Dakota's definition of "riot." *Roberts v. State*, 92 P.2d 612, 378–79 (Okla. Crim. App.

1939) ("The statute under consideration . . . was taken by this state from [South] Dakota.").

Therefore, Oklahoma based its definition on South Dakota's, which the *Noem* court found

unconstitutionally overbroad.

138.   Section 21-1311 is overbroad because it casts a massive net over both

constitutionally protected speech and proscribable true threats without regard to the

fundamental differences between and protections afforded to these categories of speech.

Specifically, Section 21-1311 defines riot as "any threat to use force or violence." Section

21-1311's indiscriminate and categorical language ignores the fact that not all threats

constitute proscribable true threats. Therefore, the statute chills the speech of speakers like

Plaintiffs who, while engaging in core political speech, might make a hyperbolic statement

not rising to the level of a true threat, but which nonetheless falls impermissibly within the

ambit of Section 21-1311's proscription. Because Section 21-1311 proscribes a substantial

amount of protected speech in relation to its otherwise legitimate sweep, *Broadrick*, 413

U.S. at 615, it must be held unconstitutionally overbroad.

---

[30] *See also Anti-Free Speech Bill Challenged in U.S. District Court*, Dakota Rural Action
(June 13, 2019), https://www.dakotarural.org/anti-free-speech-bill-challenged-in-u-s-
district-court/ (substantiating this quote from oral argument).

**COUNT TWO**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**under 42 U.S.C. § 1983**

139. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this Complaint.

140. All Plaintiffs bring this claim against Defendant O'Connor for declaratory and injunctive relief and against Defendant Prater for injunctive relief.

141. Criminal statutes that lack sufficient definiteness or specificity are commonly held void for vagueness. *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). Such legislation "may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah*, 333 U.S. 95, 97 (1948).

142. The United States Supreme Court has required that a criminal statute provide the definition of the offense with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

**I.  Section 21-1311's "Acting Together" Language is Unconstitutionally Vague.**

143. Laws that lack a *mens rea* requirement may be unconstitutionally vague because they fail to provide clear notice as to what conduct would result in a criminal conviction. *See City of Chicago v. Morales*, 527 U.S. 41, 55 (1999). A criminal statute "must be drawn in language sufficient to apprise the public of exactly what conduct is

forbidden" and cannot lack an "ascertainable standard for the determination of guilt."

*Hayes v. Mun. Ct. of Okla. City*, 487 P.2d 974, 976 (Okla. Crim. App. 1971)

144.    Section 21-1311's "acting together" language does not include a *mens rea* requirement for a person to be held criminally liable for participating in a riot. The glaring lack of specified intent in Section 21-1311's language means the statute does not provide clear notice to the ordinary Oklahoma citizen as to the difference between standing peacefully on the street in a protest that happens to turn violent due to other malicious actors and actually being the actor who throws a Molotov cocktail or smashes a car.

145.    Section 21-1311's lack of clear intent standards does not provide sufficient notice to peaceful protesters exercising their First Amendment rights such that they are "apprise[d] … of exactly what conduct is forbidden," *Id*. Therefore, the statute must be found void for vagueness.

## II.    Section 21-1311 Invites Arbitrary and Discriminatory Enforcement.

146.    Vague criminal statutes may be invalidated if they hold the potential to authorize or foster arbitrary and discriminatory enforcement. *Morales*, 527 U.S at 55; *see Kolender*, 461 U.S. at 357–58 (noting that the most important requirement of the void for vagueness doctrine is that the legislature create basic instructions that direct law enforcement).

147.    Defendant Prater used Section 21-1311 in a viewpoint discriminatory manner against Plaintiffs by charging them with Incitement to Riot for speech with which he disagrees: speech critical of law enforcement. The vague language of Section 21-1311 invites this discriminatory enforcement. Plaintiffs and racial justice protesters like them

have spoken and continue to speak under threat of prosecution under a vague statute, where they are threatened prosecution of a felony for protected conduct.

148.    It is particularly concerning that Section 21-1311 does not provide notice to the ordinary Oklahoman citizen as to the scope of the statute's proscription or the existence of any *mens rea* requirement because such vague language does not create basic instructions that direct law enforcement.

149.    Section 21-1311 does not establish minimal guidelines for law enforcement to properly distinguish an innocent participant of a public demonstration that turns violent from the participant who threatens to use violence or force and intends to do so. The sheer lack of a *mens rea* requirement in the statute to guide law enforcement in making arrests creates a strong possibility that police officers will arrest innocent, peaceful protesters who are related to organizations disliked by public officials.[31] Therefore, Section 21-1311 is

---

[31]The passage of H.B. 1674 helped reveal a special animus against particular protest movements and causes—*e.g.*, Black Lives Matter. For example, state legislators introduced, and the governor signed, H.B. 1674, affording a liability shield to motorists who injure or kill protesters while "fleeing from a riot," at the earliest possible time following the 2020 protests sparked by the death of George Floyd in Minneapolis, Minnesota. Ballotpedia, *2021 Oklahoma Legislative Session*, https://ballotpedia.org/2021_Oklahoma_legislative_session (introduction of bill); Okla. State Legislature, *Bill Information for HB 1674*, http://www.oklegislature.gov/BillInfo.aspx?Bill=hb1674&Session=2100 (signing of bill); *cf.* H.B. 1565 (codifying immediate termination for government employees convicted of unlawful assembly or incitement to riot); H.B. 1643 (prohibiting publication of law enforcement officers' identifying information with an intention to "threaten, intimidate or harass."). Moreover, legislators have made public statements further revealing that concerning animus. *E.g.*, Rob Standridge, Facebook (May 30, 2020), https://www.facebook.com/page/395511077198384/search?q=black%20lives%20matter (BLM is a "leftist political group" that many would characterize as a "terrorist group."); Kevin McDugle, Facebook (June 17, 2020), https://www.facebook.com/permalink.php?story_fbid=3367963906647506&id=7334010

ripe for inconsistent and discriminatory enforcement, which infringes First Amendment freedoms and reveals impermissible vagueness under the Fourteenth Amendment.

150.   Because Section 21-1311's "any threats" language and its "acting together" language lack sufficient definiteness such that ordinary people are apprised of exactly what conduct is forbidden, and because the Statute's language permits or fosters arbitrary and discriminatory enforcement, Section 21-1311 is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause. Therefore, the Statute unconstitutionally chills the speech of speakers like Plaintiffs who, while engaging in core political speech, are unable to determine which of their statements may be subject to criminal sanctions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A)   Declare that the Statute violates the First and Fourteenth Amendments to the United States Constitution as set forth in this Complaint;

B)   Preliminarily and permanently enjoin enforcement of the Statute;

C)   Award Plaintiffs nominal damages for the past loss of their constitutional rights as set forth in this Complaint;

D)   Award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

E)   Grant such other and further relief as this Court may deem just and proper.

---

86770481 ("BLM is no longer BLM but a Democrat movement. Guess who hires people to protest—the Democrat movement.").

Respectfully submitted,

*/s/* Megan Lambert
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327
Oklahoma City, OK 73113
mlambert@acluok.org

/s/Jared K. Carter
Jared K. Carter*
Cornell First Amendment
Law Clinic
Myron Taylor Hall
Ithaca, NY 14850
jc2537@cornell.edu

Dated: June 23, 2022

*Pro Hac Vice Application
Forthcoming*

41